## McTamany's Estate.

*Decedent's estates—Claims for services—Boarding and nursing—Dec-larations—Evidence.*

A claim for board and nursing a decedent will be sustained against such decedent's estate where competent witnesses testify positively and without contradiction to declarations made by the decedent that such services were to be paid for, although the rate of compensation was not fixed.

Argued Oct. 25, 1910.   Appeal, No. 80, Oct. T., 1910, by Catharine McCool, from decree of O. C. Blair Co., No. 78, 1910, sustaining exceptions to auditor's report in Estate of Sarah McTamany, deceased.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Affirmed.

Exceptions to report of C. J. McCullough, Esq., rejecting claims of William J. Maher and wife and Thomas Monahan and wife for services rendered in boarding and nursing decedent.

SHULL, P. J., specially presiding filed an opinion, the material portion of which was as follows:

1. That decedent was about seventy years of age; that her left hand had been crippled for years; that she was afflicted with heart disease, and that she suffered from a superficial or supperating cancer in her left side, incapacitating her from employment, and rendering her unpleasant to attend, by reason of the obnoxious disease.

2. That there was washing done, care, nursing and attention rendered and boarding furnished by claimants to decedent for several years immediately preceding her decease, and for which she said she would pay, and had at the time means with which to pay.

3. That the claimants were not related to her by blood or marriage.

These facts are established by disinterested witnesses, whose testimony stood before the auditor unquestioned, unimpeached and uncontradicted.   Let us refer briefly to this testimony.   Miss Monahan testifies that about a year before decedent left, when she came there the last time, she stated to her mother that. "the money that she had laid away, she wanted to pay Mamma for her trouble, as she was a great deal of trouble."   Paul testifies that in presence of his father and mother decedent said: "She wanted the money she put away to pay mother."   Mrs. Anthony McNellis testifies that in her presence and that of Mrs. Maher, the last time she came to the home, decedent said "she would come there and intended to pay for all her trouble."   These are in part corroborated by Mrs. Cook and the physician.   The latter said he expected nothing when he attended decedent, but his claim was allowed without objection on less tenable grounds than that of these claimants.   He further testifies to the obnoxious character of the disease with which decedent was afflicted, and that the services were actually rendered by these claimants, and that it was fully worth the amount sought to be recovered.   He is also corroborated by other witnesses on the matter of the actual services rendered and the character of such attendance.   But it is urged by the zealous counsel who is objecting to the claims, in face of this testimony, that it is not positive evidence, and that conceding the service rendered, it was done through a spirit of friendship and charity and not under a contract, which seems likewise to be the conclusion which moved the mind of the auditor.   Admitting that both of these elements may have inspired these Samaritans to take her in and to care for her, it is not in contravention of their right to compensation.   Assuredly one not moved with compassion, who possessed neither friendship nor the spirit of charity, would take into their home an invalid afflicted with such a loathsome disease.   It would require more than the savings of a servant to allure one to take upon themselves such a charge.   They would necessarily feel

that all she had would be a miserable recompense or afford a paltry compensation for such service. If she had but little, they should be entitled to receive; if she had much, they should receive from it fair remuneration. The mere fact that she did not say how much she would pay, only that she would pay, and that they may have had no knowledge whether she had much, little or nothing should not deprive them of their rights to entire or partial recompense when she said she would pay.

"The laborer is worthy of his hire," and the performance of services which have been accepted raises an implied promise on the part of one who receives such service to compensate: Griffith's Est., 147 Pa. 274. "Implied contracts are such as reason and justice dictate, and which the law presumes from the relations and circumstances of the parties. Nothing is better settled than that the performance and receipt of services or the furnishing of board, raises an implied assumpsit by the one who receives to compensate the other." The exception to this rule is where members of a family render services to each other, and no action will lie in the absence of an express contract: Douglas's App., 82 Pa. 169. "A contract to pay for services or boarding may be express and binding without all of the terms being defined. The gist is an actual agreement to pay, and if the sum be not expressed it will be implied to be the value:" Miller's App., 100 Pa. 568.

The case at bar is not one of the class of cases where boarding was furnished and services rendered in expectation of a legacy by a nephew, and, upon the failure of the legacy, an attempt to recover on a quantum meruit, as in Weaver's Est., 182 Pa. 349; or, where the presumption of payment periodically from the custom in domestic services arises, as, under the English cases, and now engrafted upon our laws in a long line of decisions: Coulston's Est., 161 Pa. 151. In this latter case the claimant was a servant, "a maid of all work," and it was held to be entirely incredible that, having no other means of support than her wages, and the person amply able to pay, that

such wages would remain unpaid for three and one-half years.

The trend of authorities are to the effect that stale claims are viewed by the courts with suspicion and scrutinized with care: Mueller's Est., 159 Pa. 590; and that the burden of proof is upon the claimant to legally establish the claim: Heffner's Est., 134 Pa. 436; and that in the absence of sufficient evidence there is a presumption of payment: McConnell's App., 97 Pa. 31. But, while the door is closed against such claims, it is not barred against the entry of such as are here designated by the auditor as "meritorious and as a matter of equity and common decency the same should be allowed; that the services rendered are of such a character as to merit praise and compensation." "A meritorious claim ought not to be defeated by application of any principle found necessary for the protection of estates of decedents from false demands:" Miller's App., 100 Pa. 568. The facts here show that the decedent was ancient, infirm, decrepit and crabbed, lame in one hand, afflicted with what in the testimony is called a "superfluous cancer" (evidently meaning a superficial or perhaps a suppurating cancer), a most loathsome and obnoxious disease. Realizing evidently that her earthly career was almost ended, she seeks the home of her friends of bygone days, not as an object of charity entirely, for she had laid by from her meager earning against the evil hour. She said to Mrs. Cook that "she had the money to see her out and pay in her last days, whoever took care of her." She goes to Mrs. Monahan, saying, I have laid away money to pay you for my trouble; and subsequently to Mrs. Maher says, I come intending to stay and pay for my trouble. Often she had shared their hospitality and been the recipient of kindnesses at their beneficent hands. Now she seeks them again when the shadows of night are falling. Realizing her needs, she goes to these tried and true friends, whom she knew would amply provide for her, minister to her wants and tenderly care for her in the last days, while

her life was being sapped away with the dreaded disease, and says, "Take me in, I will pay for the trouble." She does not seek the relative who is now seeking the estate. True, she did not say how much per day, week or month, nor whether at the end of week, month or year she would pay; nor that payment would be made in gold, silver, check, draft or by legacy. The implied contract says all this when death has sealed her lips and the law closes the mouths of the other party. The express contract established by evidence that is clear, full, fair, satisfactory and positive, uncontradicted and unimpeached, seems to warrant the court's intervention, because it creates a contract under the law. There was an agreement to pay and in consideration thereof the services were performed and boarding furnished. It would seem to us a monstrous rule to require claimants to show constant demands, frequent promises and that payments were not made at the end of· each day, week or month.

And, while it is true, there is no evidence of any demand having been made upon decedent in her lifetime, and the failure to make a demand is always a circumstance to which much importance attaches, nevertheless, "a failure to make a demand will not always have the effect of negativing the idea of contract:" Cummiskey's Est., 18 Pa. Dist. Rep. 43.

And now, March 11, 1910, exceptions to the report of the auditor are sustained, and the conclusions of law are reversed. The claims are allowed to participate pro rata in the fund distributed by the auditor to the heir of decedent. To which ruling exception is noted and bill sealed.

*Error assigned* was decree sustaining exceptions to auditor's report.

*J. F. Sullivan*, for appellant.

*Thos. C. Hare*, with him *Thos. H. Greevy* and *E. G. Brotherlin*, for appellees.

PER CURIAM, November 21, 1910:

The claims of the appellees did not rest only on the fact that the claimants had rendered valuable services, and a bare inference therefrom that these were not intended to be gratuitous, or upon mere declarations of the decedent made in their absence, but they have the support of evidence of declarations made in their presence and to them, which fairly implied the expression on her part of an intention that they should be compensated. Viewing the testimony as a whole, it was amply sufficient to sustain the conclusion reached by the learned judge specially presiding, that the services were rendered on the basis of an express contract, although the rate of compensation was not fixed. This is well shown in his opinion, which, after full consideration of the evidence, we think adequately discusses and correctly disposes of the questions of fact and law involved.

The decree is affirmed at the costs of the appellant.